ACCEPTED
06-14-00236-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
5/19/2015 10:48:31 AM
DEBBIE AUTREY
CLERK

**No. 06-14-00236-CR**

*IN THE COURT OF APPEALS*
*FOR THE SIXTH DISTRICT OF TEXAS*
*AT TEXARKANA, TEXAS*

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
5/19/2015 10:48:31 AM
DEBBIE AUTREY
Clerk

**PAUL ANTWANN HARLAN,**
**Appellant**

**vs.**

**THE STATE OF TEXAS,**
**Appellee**

*On appeal from Criminal District Court No. 4*
*of Dallas County, Texas*
*In Cause No. F13-56882-K*

**APPELLANT'S BRIEF**

*Counsel of Record:*

Lynn Richardson
Chief Public Defender
Dallas County, Texas

Julie Woods
Assistant Public Defender
State Bar No. 24046173
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-2

Katherine A. Drew
Chief, Appellate Division
Dallas County Public Defender's Office

Dallas, Texas 75207-4399
(214) 653-3550 *(phone)*
(214) 653-3539 *(fax)*
Julie.Woods@dallascounty.org

*Attorneys for Appellant*

## LIST OF PARTIES

**APPELLANT**
Paul Antwann Harlan

**APPELLEE**
The State of Texas

**DEFENSE COUNSEL AT TRIAL**
Brenda Vonjoe
4144 N. Central Expressway, Suite 650
Dallas, Texas 75204

Nicole Hines-Glover
3838 Oak Lawn Avenue, Suite 1000
Dallas, Texas 75219

**STATE'S ATTORNEY AT TRIAL**
Hilary Wright and Chris Johnson
Dallas County District Attorney's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

**APPELLANT'S ATTORNEY ON APPEAL**
Julie Woods
Dallas County Public Defender's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-2
Dallas, Texas 75207-4399

**STATE'S ATTORNEY ON APPEAL**
Susan Hawk (or her designated representative)
Dallas County District Attorney's Office
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399

# TABLE OF CONTENTS

LIST OF PARTIES ................................................................................... ii

INDEX OF AUTHORITIES..................................................................... iv

STATEMENT OF THE CASE ...................................................................1

ISSUES PRESENTED................................................................................1

STATEMENT OF FACTS ..........................................................................2

SUMMARY OF ARGUMENT ..................................................................14

ARGUMENT .............................................................................................15

    POINT OF ERROR 1, RESTATED........................................................15

> *The evidence is legally insufficient to support Appellant's conviction for aggravated robbery because the State failed to prove beyond a reasonable doubt that Appellant was the person who committed the charged offense.*

    POINT OF ERROR 2, RESTATED........................................................28

> *The trial court abused its discretion when it overruled Appellant's objection to the police officer's speculative testimony.*

    POINT OF ERROR 3, RESTATED........................................................32

> *The Court should reform the judgment because it incorrectly reflects a finding of true to the enhancement paragraph.*

    POINT OF ERROR 4, RESTATED........................................................32

> *The Court should reform the judgment to reflect the correct offense.*

PRAYER .....................................................................................................34

CERTIFICATE OF SERVICE ...................................................................35

CERTIFICATE OF COMPLIANCE..........................................................35

# INDEX OF AUTHORITIES

**Cases**

*Asberry v. State,*
813 S.W.2d 526 (Tex. App.—Dallas 1991, pet. ref'd).......................................32

*Benitez v. State*,
No. 05-13-00199-CR, 2014 Tex. App. LEXIS 7651 (Tex. App.—Dallas July 15, 2014, pet. ref'd) (not designated for publication) .......................................... 18, 25

*Bigley v. State,*
865 S.W.2d 26 (Tex. Crim. App. 1993)............................................................32

*Brooks v. State*,
323 S.W.3d 893 (Tex. Crim. App. 2010) (plurality op.) ....................................17

*Burden v. State,*
55 S.W.3d 608 (Tex. Crim. App. 2001)............................................................29

*Clayton v. State*,
235 S.W.3d 772 (Tex. Crim. App. 2007)...........................................................17

*Gardner v. State*,
306 S.W.3d 274 (Tex. Crim. App. 2009)...........................................................18

*Hooper v. State*,
214 S.W.3d 9 (Tex. Crim. App. 2007)......................................................... 17, 25

*Jackson v. Virginia*,
443 U.S. 307 (1979) ..........................................................................................17

*Madrigal v. State*,
347 S.W.3d 809 (Tex. App.—Corpus Christi 2011, pet. ref'd).........................30

*Merritt v. State*,
368 S.W.3d 516 (Tex. Crim. App. 2012)...........................................................18

*Miller v. State*,
667 S.W.2d 773 (Tex. Crim. App. 1984)...........................................................18

*Miranda v. Arizona*,
    384 U.S. 436 (1966) ........................................................................................8

*Solomon v. State*,
    49 S.W.3d 356 (Tex. Crim. App. 2001)........................................................ 30, 31

*Williams v. State*,
    No. 05-12-01465-CR, 2014 Tex. App. LEXIS 8341 (Tex. App.—Dallas July 30,
    2014, pet. ref'd) (mem. op., not designated for publication) ...............................18

**Statutes**

TEX. PENAL CODE § 12.32................................................................................33

TEX. PENAL CODE § 29.03................................................................................33

TEX. R. EVID. 602.........................................................................................29

**Rules**

TEX. R. APP. P. 43.2(b).................................................................................32

TEX. R. APP. P. 44.2(b).................................................................................31

**TO THE HONORABLE COURT OF APPEALS**:

**COMES NOW** Appellant, Paul Antwann Harlan, and submits this brief on appeal from a conviction for aggravated robbery in Criminal District Court No. 4 of Dallas County, Texas, the Honorable Dominique Collins, judge presiding.

## STATEMENT OF THE CASE

A grand jury indicted Appellant for aggravated robbery with a deadly weapon. (CR: 10). Appellant pleaded not guilty to the charge and proceeded to jury trial. (RR3: 8; RR4: 13). The jury found Appellant guilty of the charged offense. (CR: 96; RR5: 88). Appellant pleaded true to one enhancement paragraph alleging a prior felony conviction. (CR: 10; RR6: 4). The jury assessed a sentence of 50 years' imprisonment and a $10,000 fine. (RR6: 14-15). The trial court overruled Appellant's motion for new trial. (CR: 86). Appellant timely filed his notice of appeal. (CR: 88).

## ISSUES PRESENTED

### POINT OF ERROR 1

*The evidence is legally insufficient to support Appellant's conviction for aggravated robbery because the State failed to prove beyond a reasonable doubt that Appellant was the person who committed the charged offense.*

### POINT OF ERROR 2

*The trial court abused its discretion when it overruled Appellant's objection to the police officer's speculative testimony.*

1

**POINT OF ERROR 3**

*The Court should reform the judgment because it incorrectly reflects a finding of true to the enhancement paragraph.*

**POINT OF ERROR 4**

*The Court should reform the judgment to reflect the correct offense.*

## STATEMENT OF FACTS

Around 7:45 p.m. on May 7, 2013, Anwarul Hoque and Maria Ochoa were working at Hilda's Grocery, a convenience store located at 1016 Murdock Road in Dallas, Texas. (RR4: 18-19, 44). Two men walked into the store and quickly walked toward Ochoa, ordering her to get on the floor. (RR4: 45). Hoque, who was replenishing the store's Dr. Pepper supply at the time, saw the two men walk into the store. (RR4: 24). Hoque observed one of the men carrying a gun. (RR4: 24). The man with the gun walked toward Hoque and grabbed him. (RR4: 24). Hoque saw Ochoa on the ground. (RR4: 24).

One of the men, later identified as Latiki Bosman, wore a gray hooded sweatshirt and carried a red bag. (RR4: 32, 59, 151; State's Ex. 11 Part 003—Camera #5; State's Ex. 11 Part 003—Camera #7; State's Ex. 11 Part 008—Camera

2

#14).[1] The other suspect wore a dark hooded sweatshirt with "Brooklyn" on the front and a camouflage hat. (RR4: 32, 151; State's Ex. 11 Part 003—Camera #5; State's Ex. 11 Part 003—Camera #7; State's Ex. 11 Part 005—Camera #10; State's Ex. 11 Part 006—Camera #11; State's Ex. 11 Part 008—Camera #14). The suspect wearing the dark hoodie was the person with the gun. (RR4: 32; State's Ex. 11 Part 005—Camera #10; State's Ex. 11 Part 008—Camera #14).

The two men, whose faces were mostly covered, told Hoque to open the register and give them the money. (RR4: 25). The man wearing the gray hoodie punched Hoque's face. (RR4: 26, 28; State's Ex. 23). Hoque testified that he was hurt from the punch and scared. (RR4: 36-37).

Two security guards happened to stop at Hilda's Grocery during the robbery.[2] (RR4: 37). They apprehended Latiki. (RR4: 37-38, 48-49, 53). Richard Delatorre, a Dallas police officer, responded to a robbery-in-progress call for Hilda's Grocery. (RR4: 51-53). When Delatorre arrived, he saw the two armed security guards in front of the store and the suspect in handcuffs at the store's front door. (RR4: 53). Delatorre waited for another officer to arrive then took steps to

---

[1] State's Exhibit 11 is the video surveillance from Hilda's Grocery. (RR4: 29-32). The exhibit in the record includes 11 separate videos, each depicting a different angle inside and outside Hilda's Grocery. Each video is labeled by a "Part" number on the disc of the record, and each of these parts corresponds to a camera number, as identified in the recording itself.

[2] The security guards were not employees of Hilda's Grocery. (RR4: 58). They did not testify at trial.

ensure that no one else was inside the store. (RR4: 54). Delatorre observed damage to the store as a result of the robbery. (RR4: 54-57; State's Ex. 13, 14, 16, 17, 18, 19). He transported Latiki to jail. (RR4: 58-59).

The evening of May 7, 2013, Juan Pina drove to his mother's house at 7821 Cup Circle in Dallas, Texas, where he lived. (RR4: 65-66). As he exited his '97 Honda Accord and walked towards the front door, he heard the metal gate at the side of the house shake. (RR4: 67-68). A man wearing a hoodie, sweatpants, and an army hat and carrying a dark backpack approached Pina and offered money for Pina to drive the man out of the area. (RR4: 69, 71, 74). When Pina refused, the man offered more money, pulled out a chrome handgun from the pocket of his hoodie, and pointed the gun at Pina's face. (RR4: 69). The man said, "Give me your fucking keys." (RR4: 70). Pina complied then walked to his house. (RR4: 70).

The man with the gun walked backwards toward the car and entered the vehicle. (RR4: 70). Pina went inside his house and told his cousins, who were at the house that evening, what happened. (RR4: 71). One of his cousins went outside and told the man to get out of Pina's car. (RR4: 71). When the man was not able to successfully start Pina's car, he grabbed his backpack, slung it over his shoulder, and then ran away from the location. (RR4: 70-71). Pina's other cousin chased the man down the street. (RR4: 71).

Pina saw a box of cigars underneath the back tire of the car and money and papers inside the car. (RR4: 71-73; State's Ex. 45, 46). Pina testified that he did not leave these items inside or near his car. (RR4: 71-73).

That same day, Armando Dominguez, a corporal with the Dallas Police Department's K-9 unit, received a call for service regarding Hilda's Grocery and a suspect who had fled on foot. (RR4: 106, 109-10). Dominguez took Pico, his trained police dog, to the location where the Lexus used in the aggravated robbery crashed through a fence and into a tree. (RR4: 86-87, 89, 111; State's Ex. 32). This house was located on Irons Street, a street that dead-ends behind Pina's house. (RR4: 86-87; State's Ex. 30, 31, 32, 38).

Pico was trained to pick up odors to help find and apprehend suspects. (RR4: 107). Dominguez took Pico through the yard and to the crashed Lexus. (RR4: 111). Pico went through the Lexus then went down the side of the backyard to an open gate. (RR4: 111). Pico was on a "hard track" with his nose down to the ground. (RR4: 112). He walked to the street and made a right turn. (RR4: 113). When Pico came to a sewer ditch on Lawton Drive, he lay down near a pistol, hat, and shirt, signaling that he found an article. (RR4: 86-87, 113-14; State's Ex. 57, 58, 59, 60, 61, 62, 64). Dominguez notified the crime scene unit that Pico located these items. (RR4: 114-15). Dominguez did not touch these items and continued to search the area for the suspect. (RR4: 115). Pico did not locate the suspect. (RR4: 115, 116).

5

Scott Jay, a Dallas police officer, responded to the aggravated robbery call on May 7, 2013, to help search for the suspect who left the scene. (RR4: 120). He arrived at the location where the Lexus crashed. (RR4: 86-87, 121-22; State's Ex. 32). Jay and his partner established a perimeter for the area where they thought the suspect might be. (RR4: 120-21). They did not locate the suspect. (RR4: 121).

Jeff Loeb, a Dallas police detective in the robbery unit, was on call the evening of May 7, 2013. (RR4: 133, 135). After receiving notification of the robbery at Hilda's Grocery, he responded to the location and started working the case that night. (RR4: 136). He interrogated Latiki that night. (RR4: 136). Latiki did not give Loeb any information about the second suspect's identity. (RR4: 136). Loeb conducted his follow-up investigation to determine the name of the second suspect. (RR4: 136).

Two days later, on May 9, 2013, Jay responded to a service call for the same area to which he responded on May 7, 2013. (RR4: 122). A woman called 911 to report that an individual was in her yard looking for some items.[3] (RR4: 121). The 911 caller reported having seen this person on more than one occasion. (RR4: 121). She provided a physical description of the person she saw in her yard. (RR4: 122). She described the individual as a black male, six feet tall, and 160 pounds. (RR4:

---

[3] This 911 caller did not testify at trial.

129). She also described a yellow Saturn she observed in conjunction with the suspicious person in her yard. (RR4: 122, 127).

The physical description of the person in the 911 caller's yard matched the description of the suspect who fled Hilda's Grocery in the May 7, 2013, police report. (RR4: 124). The May 7, 2013, report described the suspect as a black male, six feet two inches tall, and 160 pounds. (RR4: 130). Using prior police reports with Latiki's name and information he learned from speaking with witnesses, Jay determined that the individual in the 911 caller's yard was Keonte Bosman.[4] (RR4: 124-25, 126). Jay put Keonte's name in his May 9, 2013, report and sent it to the lead detective in this case. (RR4: 125).

On May 9, 2013, Loeb received information from the officers who had responded to the suspicious person call at the location where the Lexus crashed. (RR4: 137). He learned from one of the responding officers that this suspicious person might be Keonte Bosman. (RR4: 137). Loeb also learned from his research that Latiki and Keonte had been arrested previously.[5] (RR4: 137-38). Loeb obtained a warrant for Keonte's arrest. (RR4: 137).

---

[4] The record does not clearly identify whether Jay spoke with other witnesses besides the 911 caller on May 9, 2013. The prosecutor, defense counsel, and Jay referred to "witnesses," indicating more than one witness, but did not clarify whether there were actually multiple witnesses who observed the suspicious person on May 9, 2013. (RR4: 124, 125-26).

[5] Loeb did not specify whether Latiki and Keonte had been arrested together previously or whether each had been arrested previously but on separate occasions. (RR4: 137).

Loeb also obtained a search warrant for the Lexus that the police had impounded. (RR4: 138). Inside the trunk of the car, Loeb found a wallet with Appellant's social security card and birth certificate. (RR4: 138, 144-47; State's Ex. 74, 77). He believed that this wallet identified Appellant as the potential suspect in the robbery of Hilda's Grocery. (RR4: 138). Loeb also found a wallet that he believed belonged to Latiki. (RR4: 138, 145; State's Ex. 73, 75). This wallet contained credit cards bearing the last name of Bosman, but none of the first names was Latiki. (RR4: 138, 145; State's Ex. 78). This wallet does not appear to have any identification for Latiki. (RR4: 145; State's Ex. 73, 75). Loeb also found two cell phones which he testified belonged to Latiki and Appellant, but for which Loeb had no evidence of ownership. (RR4: 145, 158; State's Ex. 72). He did not obtain a warrant for the cell phones and did not testify about how he determined ownership of these cell phones. (RR4: 157).

After having Keonte arrested and brought to police headquarters, Loeb read Keonte's *Miranda*[6] rights. (RR4: 138). Keonte agreed to speak with Loeb. (RR4: 138). Keonte explained that he knew Appellant. (RR4: 139). Keonte provided a voluntary DNA sample. (RR4: 141). After talking with him, Loeb ruled out Keonte as the suspect with Latiki in the robbery of Hilda's Grocery. (RR4: 138). Loeb decided that the suspect with Latiki was Appellant. (RR4: 14). Keonte and Latiki

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

8

are related to each other.[7] (RR4: 131-32). There is no evidence in the record suggesting that Appellant is related to Keonte or Latiki.

Loeb testified that, "based mostly on height," he was comfortable that he knew Appellant was the suspect in this case. (RR4: 140). Loeb testified that Keonte is six feet one inch tall, Appellant is five feet six inches tall, and Latiki is five feet nine inches tall. (RR4: 140, 169). Loeb explained, "So based on me knowing the height of Latiki Bosman, it was clear to me that the second suspect, the one that had the gun in the video, did appear to be shorter than the other suspect." (RR4: 140-41).

After ruling out Keonte as a suspect and finding Appellant's wallet in the trunk of the Lexus, Loeb obtained a warrant for Appellant's arrest. (RR4: 147). Phillip Lawler, a senior corporal in the Dallas Police Department, arrested Appellant on June 18, 2013, without incident. (RR4: 170, 172-73). Loeb met with Appellant and collected a DNA sample pursuant to a warrant. (RR4: 147-48).

Loeb sent the hat, shirt, and handgun collected by the police on May 7, 2013, along with Keonte's and Appellant's DNA samples, to the Southwestern Institute of Forensic Sciences ("SWIFS") for testing and analysis. (RR4: 149).

---

[7] The evidence in the record suggests that Keonte and Latiki are brothers. (RR4: 128, 156-57; RR5: 84-85).

Joshua Cordes, the police officer who photographed and collected evidence from the crime scene, placed the hat and shirt together in the same box. (RR4: 159).

Kylie Slaughter, a forensic biologist for SWIFS, received the hat, shirt, and pistol collected in this case. (RR4: 98, 100; RR5: 4, 6, 13; State's Ex. 63, 65, 66, 82). Her job is to determine who wore an item of clothing or touched an item. (RR5: 5). In this case, the police requested wearer and handler samples only. (RR5: 6-7). The police did not request testing for body fluids on these three items. (RR5: 7).

Slaughter received the shirt and hat together in the same bag. (RR5: 9). She took two swabbings and a cutting from the shirt.[8] (RR5: 7-8). The two swabbings were from the interior of the sleeves and the interior of the neckline because she thought these areas likely would have come into contact with the skin of the person who wore the shirt. (RR5: 7-8). She took a cutting from the shirt's neckline. (RR5: 7-8). Slaughter also took a swabbing of the entire sweatband inside the hat, a second swabbing of the entire brim of the hat, and a cutting from the hat's sweatband. (RR5: 9). She placed the swabbings and cuttings into individual Ziploc bags which she then deposited into heat-sealed bags. (RR5: 10). She transferred

---

[8] A swab is similar to a Q-tip. (RR5: 11). To collect a swabbing for testing purposes, Slaughter moistened a swab and ran the swab across the target areas of the items. (RR5: 11).

10

these bags to the freezer for the DNA analyst to retrieve for further analysis. (RR5: 10).

Slaughter also took one swab of the firearm. (RR5: 11). She swabbed the grip, the trigger, the trigger guard, the textured buttons and safety, and the areas of the slide. (RR5: 11-12). She placed this swabbing in a ziploc bag inside a heat-sealed envelope and placed the bag in the freezer. (RR5: 12).

On two separate occasions, Angela Fitzwater, an employee with SWIFS, performed DNA testing on the swabbings and cuttings that Slaughter collected from the hat, shirt, and pistol. (RR5: 23-24). The results of Fitzwater's first round of DNA testing culminated in her report dated October 7, 2013. (RR5: 29-30; State's Ex. 80). She tested the swabbing of the gun, the cutting from the hat, and the cutting from the shirt. (RR5: 31). Fitzwater was able to develop a DNA profile for the swabbing of the shirt, hat, and pistol. (RR5: 26-27). She also received the buccal swabs Loeb obtained from Keonte and Appellant. (RR5: 27).

Fitzwater determined that the DNA profile on the hat was a mixture of at least two people, but she was not able to determine the number of contributors. (RR5: 28; State's Ex. 80). She also observed a third DNA profile, which she identified as "unknown male," through the course of her testing of the items. (RR5: 30, 32; State's Ex. 80). Fitzwater excluded Appellant, Keonte, and the unknown male from the DNA profile on the hat. (RR5: 33; State's Ex. 80).

11

Because Fitzwater found a low level of DNA on the gun, she was unable to determine the number of contributors. (RR5: 30; State's Ex. 80). The DNA profile on the gun contained genetic markers that corresponded to Appellant's DNA profile. (RR5: 31; State's Ex. 80). Based on this information, Fitzwater included Appellant as a possible contributor on the gun. (RR5: 30-31). She excluded Keonte and the unknown male as contributors to the DNA profile on the gun. (RR5: 31).

Fitzwater also tested the shirt and found a DNA profile for the unknown male. (RR5: 32; State's Ex. 80). The DNA profile on the shirt did not match Appellant or Keonte. (RR5: 32; State's Ex. 80). Fitzwater explained that the shirt cutting contained a high level of DNA. (RR5: 32).

About six months later, Fitzwater received another request to perform DNA analysis on the two remaining hat samples and the two remaining shirt samples. (RR5: 33). Fitzwater included the results of this additional DNA testing in her August 4, 2014, report. (RR5: 37; State's Ex. 81). Loeb requested this additional testing because the first testing of the items generated low results. (RR4: 166-67). Fitzwater explained that this was not a re-testing of the items she had previously tested. (RR5: 33). Rather, she tested the remaining samples she had not previously tested. (RR5: 33).

Fitzwater tested three shirt samples. (State's Ex. 81). Based on this second round of testing, Fitzwater concluded that one shirt sample contained a DNA

12

profile mixture of at least two people. (RR5: 35; State's Ex. 81). She was able to distinguish a major and minor profile. (RR5: 35; State's Ex. 81). She determined that the major contributor was the unknown male. (RR5: 35; State's Ex. 81). She also determined that the DNA profile of the minor contributor did not match Appellant or Keonte. (State's Ex. 81).

In the remaining two shirt samples, Fitzwater observed the DNA profile of the unknown male. (State's Ex. 81). This DNA profile on these shirt samples did not match Appellant or Keonte. (State's Ex. 81).

Fitzwater concluded that the hat contained a DNA profile mixture of at least two people, but could not determine a major and minor contributor. (RR5: 36; State's Ex. 81). She included Appellant as a possible contributor. (RR5: 36-37; State's Ex. 81). She excluded both Keonte and the unknown male from the hat samples. (RR5: 36-37; State's Ex. 81).

Fitzwater testified that she was able to create a probability of the likelihood that the DNA profile on the items came from one person or did not come from an unknown person. (RR5: 37-38). She concluded that one hat sample indicated that the probability Appellant was a possible contributor was 1 in 1,160. (RR5: 38; State's Ex. 81). In the second hat sample, Fitzwater concluded that the probability Appellant was a possible contributor was 1 in 648. (RR5: 38; State's Ex. 81). She also concluded that the probability that the unknown male was a contributor to the

13

DNA profile on the shirt samples was 1 in 204,000,000,000,000. (RR5: 39; State's Ex. 81).

## SUMMARY OF ARGUMENT

**Issue 1:**     The State failed to prove beyond a reasonable doubt the essential element of identity in this case. The weak circumstantial evidence in this case does not lead to a reasonable inference that Appellant was the person who committed aggravated robbery with Latiki. Because the State failed to prove beyond a reasonable doubt that Appellant was the person who committed the offense, this Court should reverse the conviction and enter a judgment of acquittal.

**Issue 2:**     The trial court's erroneous admission of speculative testimony in this case affected Appellant's substantial rights. The officer's testimony that Appellant placed his wallet in Latiki's car before committing aggravated robbery together was not supported by any factual evidence. Rather than offering concrete facts, the officer speculated that Appellant was criminally connected to the charged offense because his wallet was in the trunk of the car parked at Hilda's Grocery. This Court cannot be certain that the officer's speculative testimony did not contribute to the conviction in this case.

**Issues 3 and 4:**     The Court should reform the judgment to delete the finding of true to the enhancement paragraph and to include the correct offense

14

name in this case because the record contains the necessary information for this Court to do so.

## ARGUMENT

### POINT OF ERROR 1, RESTATED

***The evidence is legally insufficient to support Appellant's conviction for aggravated robbery because the State failed to prove beyond a reasonable doubt that Appellant was the person who committed the charged offense.***

**Facts**

Neither Hoque nor Ochoa could identify the two suspects in the robbery of Hilda's Grocery on May 7, 2013. Hoque explained that he did not pay attention to the suspects' clothes. (RR4: 25). He did not see their faces because they wore "masks." (RR4: 25). He could not recall whether they wore shorts or pants, long-sleeved or short-sleeved shirts. (RR4: 25). He was too scared to pay attention to these details. (RR4: 25). He did not make an in-court identification of the person with Latiki. (RR4: 17-42).

Ochoa recalled that the suspects "had sweaters on with caps, and their faces covered." (RR4: 45). She did not make an in-court identification of the person with Latiki. (RR4: 43-50).

Pina did not make an in-court identification of the person who attempted to carjack him the night of May 7, 2013. (RR4: 11, 65-79). During a photo lineup administered by Loeb a few days after the offense date, Pina chose Keonte as the

person who attempted to take his car. (RR4: 11, 79). Prior to trial, and at Appellant's request, the court held a hearing outside the jury's presence. (RR4: 5-12). During this hearing, Pina affirmatively stated that he could not tell whether the person who approached him the night of May 7, 2013, at his mother's house was in the courtroom. (RR4: 11).

When Loeb spoke with Latiki about the robbery, Latiki remained tight-lipped about his accomplice. (RR4: 136). Loeb suspected that Latiki would not give information about his accomplice because the accomplice was one of Latiki's relatives. (RR4: 164).

Although Loeb initially believed that Keonte Bosman was the second suspect with Latiki, he ruled out Keonte as a suspect. (RR4: 138). Loeb concluded that Appellant was the person who committed the robbery with Latiki. (RR4: 136). He testified that he came to this conclusion based on his personal assessment of the height of the person with Latiki, the fact that Appellant's wallet and cell phone were inside Latiki's Lexus, and the DNA testing results. (RR4: 136, 138, 140, 141; RR5: 50).

Despite the fact that the DNA testing showed the presence of an unknown male's DNA profile on the shirt, Loeb testified that he did not hesitate in his decision to focus on Appellant as the suspect. (RR5: 50). He explained that because he "was already looking at a male as [his] suspect…it just confirmed that

16

it was a male suspect's DNA on a shirt." (RR5: 50).

## Standard of Review

Legal sufficiency of the evidence is measured by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, *i.e.*, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319, n. 12 (1979). The *Jackson* standard is the only standard a reviewing court should apply to determine if the State proved each and every element of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). The reviewing court must defer to the fact finder's credibility and weight determinations since the trier of fact is the sole judge of the credibility of a witness's testimony. *Id*. at 899. The reviewing court "determine[s] whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). A court's review of the evidence includes all admitted evidence regardless of whether the admission of evidence was erroneous. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

**Applicable Law**

It is incumbent upon the State to prove beyond a reasonable doubt that the defendant is the person who committed the charged offense. *Miller v. State*, 667 S.W.2d 773, 775 (Tex. Crim. App. 1984); *see also Williams v. State*, No. 05-12-01465-CR, 2014 Tex. App. LEXIS 8341, at *8-9 (Tex. App.—Dallas July 30, 2014, pet. ref'd) (mem. op., not designated for publication). The State must prove that the defendant was criminally connected to the offense. *See Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). Identity may be shown by direct evidence, circumstantial evidence, or reasonable inferences from this evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009); *see also Benitez v. State*, No. 05-13-00199-CR, 2014 Tex. App. LEXIS 7651, at *8 (Tex. App.—Dallas July 15, 2014, pet. ref'd) (not designated for publication).

**Analysis**

The State failed to prove beyond a reasonable doubt that Appellant was the person who committed the charged offense with Latiki. Loeb's personal visual assessment of the height of the second suspect, as depicted on the video surveillance, and the DNA results are not sufficient proof to establish that Appellant committed the charged offense. Furthermore, the presence of Appellant's wallet inside Latiki's car did not prove beyond a reasonable doubt that Appellant was the person with Latiki inside Hilda's Grocery on May 7, 2013.

18

### The Wallet.

The only evidence potentially probative of Appellant's involvement in the offense was that a wallet containing Appellant's birth certificate and social security card was inside the trunk of the car driven prior to and after the robbery of Hilda's Grocery. Indeed, Loeb only considered Appellant a suspect after he found Appellant's wallet inside the Lexus. Yet this piece of evidence hardly proves that Appellant was the person who actually committed the offense with Latiki. There is no evidence that the wallet contained any picture identification matching Appellant's physical description. There is no evidence that Appellant placed the wallet in the car. Nor is there evidence of how long the wallet had been inside the car. Furthermore, as plainly visible on the video surveillance, there is no evidence that Latiki and his accomplice placed any items in the trunk of the car before entering Hilda's. Without any proof of when Appellant placed his wallet inside Latiki's car, if Appellant did in fact place it there himself, the mere presence of the wallet in the car does not reasonably lead to an inference that Appellant committed aggravated robbery with Latiki.

No rational juror could reasonably infer that Appellant committed the charged offense simply by virtue of his wallet being inside Latiki's car. Without any other evidence establishing when and how the wallet ended up in Latiki's car,

19

it is pure speculation that Appellant placed his wallet inside the car prior to committing robbery with Latiki.

Additionally, there is no evidence as to who drove the Lexus from Hilda's and crashed the car after the robbery. Indeed, according to Loeb's recollection, the 911 caller who reported the suspicious person in her yard two days after the robbery reported that the suspicious person said his brother had crashed the car. (RR4: 156). There is no evidence in the record that Appellant is Keonte's brother. Keonte knew Appellant, but never indicated that they were related. This suspicious person matched Keonte's physical description. If the suspicious person in the yard near the crash site was Keonte, as the evidence suggests, then someone other than Appellant crashed the Lexus. Yet even if the jury believed that Appellant drove the Lexus and crashed the car, despite the lack of evidence establishing such a conclusion, it would not be logical to infer that Appellant left his wallet with his identification inside the abandoned car.

At most, the fact that a wallet containing documents with Appellant's name was inside Latiki's car simply establishes that someone placed the wallet inside the trunk at some point prior to the execution of the search warrant. There was no evidence that Appellant placed his wallet inside Latiki's car and no evidence that the fact that Appellant's wallet was inside this car meant that Appellant committed

robbery with Latiki. Furthermore, the record is completely devoid of any evidence that Appellant was at or near Hilda's Grocery on May 7, 2013.

*DNA Results.*

Loeb testified that he believed Appellant was the suspect based on the DNA results. However, this testimony is not supported by the facts in the record. The results of the DNA testing were not complete until October 7, 2013, and August 4, 2014. (RR5: 24, 34; State's Ex. 80, 81). Loeb obtained an arrest warrant for Appellant on June 14, 2013. (CR: 11-14) Dallas police officer Phillip Lawler collected the warrant for Appellant's arrest on June 18, 2013, and gathered intelligence about Appellant's location. (RR4: 172-73). Based on the arraignment information in the record, Appellant was arrested on June 18, 2013, nearly four months *before* the first round of DNA testing results were available. (CR: 15).

In any event, Loeb's conclusion that the DNA analysis confirmed his determination that Appellant was the second suspect with Latiki is not supported by Fitzwater's testimony about the DNA profiles on the hat, shirt, and gun. Fitzwater testified that the probability that Appellant's DNA profile was on the hat was 1 in 1,160 and 1 in 648.[9] This probability means that out of all the people in the City of Dallas, 1,084 and 1,941 people in the city, respective to each

---

[9] The different probabilities on the hat reflect the different probabilities for each hat sample Fitzwater tested. (RR5: 38).

probability, would have that same DNA profile. (RR5: 38-39). If this significantly high number of people in the City of Dallas has the same DNA profile that was on the hat, then this is quite a large pool of people who potentially wore that hat. This evidence hardly establishes proof beyond a reasonable doubt that Appellant was the person who wore the hat.

Furthermore, the likelihood that it was the unknown male's DNA on the shirt was so high that a rational jury could reasonably infer that the unknown male had worn the shirt. Fitzwater explained that out of a pool of people equal to 29,000 times the Earth's population of 7,000,000,000 people, only one person would have that same DNA profile. This strong evidence logically indicates that someone other than Appellant wore this shirt.

Fitzwater and Slaughter testified that they were not able to determine when DNA is deposited on an item. (RR5: 19, 43). Slaughter further explained that skin cells can last a long time on an item. (RR5: 19). Consequently, the fact that the hat and shirt contained a DNA profile matching Appellant's DNA profile does not establish when the DNA was deposited. This evidence does not prove that Appellant wore these items on May 7, 2013, during the aggravated robbery of Hilda's Grocery.

Slaughter also explained that DNA can transfer from item to item. (RR5: 18). Because the police collected the hat and shirt and placed them in the same bag

22

together, it is not illogical to consider the fact that DNA transferred between the items. It was only after the second round of testing on the hat that Appellant was included as a possible contributor.

The DNA results do not comport with the State's theory that Appellant wore the camouflage hat and used the shirt to cover his face during the robbery. Hoque and Ochoa testified that the second suspect's face was covered. The video surveillance shows that the second suspect's neck and face were covered by a shirt and that he wore a camouflage hat. Pico tracked the scent from the Lexus to the shirt in the ditch. Because the DNA testing established pretty conclusively that the unknown male wore the shirt, it is reasonable to infer that the unknown male was the person who covered his face with the shirt during the robbery then drove and crashed the Lexus after the robbery. Even if the jury did not believe that the unknown male was the accomplice, the DNA evidence in this case does not establish sufficient proof that Appellant was the person who covered his face with the shirt and wore the hat during the robbery.

The DNA analysis of the gun indicated a low level of DNA. Fitzwater testified that low levels of DNA mean there are not enough genetic markers to make it uniquely identified to match it to an individual. (RR5: 28-29). When the level of DNA is low, the statistical probability that a particular person is a contributor is a lot less. (RR5: 28-29). Although Fitzwater included Appellant as a

possible contributor to the gun's DNA profile, the low level of DNA on the gun renders the likelihood that Appellant's DNA was actually on the gun significantly less. Even if Fitzwater had been able to conclusively establish that Appellant's DNA was on the gun, her testing did not establish when the DNA was deposited.

*Height.*

The only other piece of evidence upon which Loeb relied to form his opinion that Appellant was the perpetrator of the robbery was Loeb's assessment of the height of the person with Latiki. Loeb's own testimony, however, established the difficulty in visually determining a person's height without measuring. He explained that "height and weight is probably the most incorrectly stated" description of suspects. (RR5: 55). Loeb's emphasis on height is hardly convincing evidence to convict Appellant as the second suspect in the robbery.

Contrary to Loeb's testimony that he could tell that the second suspect was shorter than Latiki, the video surveillance does not clearly depict that the person with Latiki was shorter than Latiki. The camera angle from behind the cash register and counter shows the two men crouching and hunched over to take items from underneath the counter. (State's Ex. 11 Part 002—Camera #5; State's Ex. 11 Part 003—Camera #7). The camera views of the suspects inside Hilda's Grocery started from a point higher than the suspects' heads and angled down in the direction of the floor. (State's Ex. 11 Part 002—Camera #5; State's Ex. 11 Part 003—Camera

24

#7; State's Ex. 11 Part 005—Camera #10; State's Ex. 11 Part 008—Camera #14). Nothing in these video recordings reflects any concrete evidence that the second suspect was shorter than Latiki. Consequently, Loeb's testimony that the second suspect is shorter than Latiki is not supported by the facts of the case. *See Hooper*, 214 S.W.3d at 15 ("[J]uries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions."); *Benitez*, 2014 Tex. App. LEXIS 7651 at *6 (recognizing that juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions).

The camera view of the suspects entering Hilda's through the front door is equally inconclusive as to the second suspect's height. Loeb testified that he was able to determine that the second suspect was shorter than Latiki based on his comparison of each suspect relative to a particular point on the lottery stand, as depicted in the video recording. Yet, the video surveillance does not support Loeb's conclusion. As the suspects pass by the lottery stand, each head appears to pass by the same point on the lottery stand, indicating that they are at least similar in height, if not the same height.

Jay testified that he recalled that the description of the second suspect in the May 7, 2013, report of the aggravated robbery was a black male, six feet two inches tall, and 160 pounds. (RR4: 130). Based on Loeb's testimony, Appellant is

five feet six inches tall. (RR4: 140-41). Therefore, it is not a reasonable inference that Appellant was the suspect based on his height in comparison to the height as noted in the police report; Appellant is a significant eight inches shorter than the height of the suspect described in the May 7, 2013, police report.

Furthermore, to infer that Appellant was the second suspect based primarily on height is not reasonable. If the evidence had shown, for example, that Appellant is seven feet tall, a relatively uncommon height, and the video surveillance depicted a man obviously more than a foot taller than Latiki, then perhaps Loeb's height analysis would be more persuasive. However, this is not the case here. According to Loeb, Appellant is five feet six inches tall and Latiki is approximately five feet nine inches tall. When considering the fact that both suspects wore head coverings that obviously added inches to their overall height, this variance in height is not probative of the identity of the person who committed the offense with Latiki.

### The Remaining Evidence.

None of the witnesses who came into contact with the second robbery suspect on May 7, 2013, made an in-court identification of Appellant as the suspect. During a photographic line-up administered a few days after the offense, Pina selected Keonte as the person who tried to carjack him and, according to the State, the person who committed the robbery of Hilda's Grocery with Latiki.

26

Consequently, no witness identified Appellant as the person who committed the robbery or as the person who attempted to take Pina's car.

A majority of the remaining evidence points away from Appellant. Latiki's refusal to confirm the name of his accomplice reasonably leads to the conclusion that Latiki committed the offense with one of his relatives, especially in light of the fact that Latiki had committed offenses with relatives in the past. (RR4: 155-56).

The only evidence indicating Appellant even knew Latiki was Keonte's statement to the police that he knew Appellant. There is no additional evidence in the record indicating whether Appellant actually knew Latiki or they spent time with each other.

Although the gun had a serial number, the State did not present any evidence to show who owned the gun. (RR4: 96-98). The lack of ownership information coupled with the low levels of DNA on the gun did not establish sufficient evidence linking Appellant to the gun used during the robbery.

### *Conclusion.*

The State failed to prove beyond a reasonable doubt that Appellant committed the charged offense with Latiki. The only evidence on which Loeb relied to conclude that Appellant committed the offense was Appellant's height, wallet, and the DNA results. Loeb's determination that Appellant committed the offense because he was shorter than Latiki is not supported by the facts in the

27

record. The fact that Appellant's wallet was inside Latiki's car did not establish that Appellant was with Latiki during the robbery; it merely placed Appellant's wallet inside the car. Finally, the DNA evidence was not strong and did not conclusively prove that Appellant wore the hat or shirt during the robbery.

Even when considering this evidence in the light most favorable to the jury's verdict, the evidence remains insufficient to prove beyond a reasonable doubt that Appellant was the person who committed aggravated robbery. Because the State failed to prove identity in this case, the Court should reverse Appellant's conviction and enter a judgment of acquittal.

**POINT OF ERROR 2, RESTATED**

***The trial court abused its discretion when it overruled Appellant's objection to the police officer's speculative testimony.***

**Facts**

Detective Loeb testified that he spoke with Keonte Bosman, about the alleged offense. (RR4: 137). Loeb believed that Keonte was the possible suspect who robbed Hilda's Grocery with Latiki. (RR4: 137). Loeb obtained an arrest warrant for Keonte, and Keonte agreed to speak with Loeb. (RR4: 137-38). After speaking with Keonte, Loeb ruled him out as a suspect in this case. (RR4: 138).

The prosecutor and Loeb then engaged in the following dialogue:

> Q. [by the prosecutor]    Okay. Was [Keonte] able to point you in a different direction?

A.     Yeah. I had obtained a search warrant prior to interviewing him, of the vehicle that was used, and when I had searched the vehicle, I did find a wallet that belonged to apparently, Paul Harlan. His wallet was in the trunk of the vehicle. There was a Social Security card and a birth certificate, I believe, that was in there that identified him as a potential suspect. There was another wallet in the same trunk that belonged to Latiki Bosman, so I had surmised that most likely the suspects had placed their wallets in the trunk of the vehicle prior to committing the robbery.

(RR4: 138). Appellant objected to this testimony as speculation. (RR4: 138-39). The prosecutor stated, "If I can respond, Your Honor, it goes with regard to his investigation of this case." (RR4: 139). The court ruled, "All right. Overruled." (RR4: 139).

## Standard of Review

A trial court's ruling regarding the admission or exclusion of evidence is reviewed under an abuse of discretion standard. *Burden v. State,* 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). Appellant recognizes that the trial court's ruling will not usually be disturbed on appeal if it is within the zone of reasonable disagreement. *Id.*

## Applicable Law

Rule 602 of the Texas Rules of Evidence prohibits a witness from testifying about matters without sufficient evidence to support a finding that the witness has personal knowledge of the matter. TEX. R. EVID. 602. Testimony that is based on

29

speculation and conjecture lacks probative value and is irrelevant. *Madrigal v. State*, 347 S.W.3d 809, 813 (Tex. App.—Corpus Christi 2011, pet. ref'd).

## Analysis

In Appellant's case, Loeb's testimony that Appellant had placed his wallet in the trunk of Latiki's car prior to robbing Hilda's Grocery was purely speculative. Loeb's own testimony affirmatively established that he "surmised" that Appellant placed his wallet in the car prior to committing the robbery. However, he articulated no other facts that would reasonably support this conclusion. Loeb did not know when the wallet was placed in Latiki's car. He had no personal knowledge about who placed Appellant's wallet in Latiki's car. He had no information about whether Appellant was actually involved in the robbery at all.

The State's response that this was part of Loeb's investigation did not convert his speculative testimony into admissible testimony. The sole purpose of the testimony was to establish the detective's conclusion that Appellant committed the robbery with Latiki because he placed his wallet in Latiki's car prior to the robbery.

## Harm Analysis

The erroneous admission of evidence is nonconstitutional error. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Appellant recognizes that an appellate court need not reverse a judgment of conviction or punishment for error

that does not affect substantial rights. *See* TEX. R. APP. P. 44.2(b). An error does not affect substantial rights if the appellate court, after reviewing the record as a whole, has fair assurance that the error did not influence the jury or had but a slight effect. *Solomon*, 49 S.W.3d at 365.

Because identity was the critical issue in this case (*see supra* Point of Error 1), Loeb's speculative testimony unquestionably affected Appellant's substantial rights. The only connection between Appellant and the robbery was that Appellant's wallet was in Latiki's car which had been in Hilda's parking lot at the time of the robbery. The record contains no other facts connecting Appellant to Hilda's Grocery. Loeb's statement that Appellant placed his wallet in Latiki's car prior to committing robbery was a speculative conclusion. Without Loeb's speculative testimony, the jury could not have reasonably inferred that Appellant placed his wallet in Latiki's car then committed robbery with Latiki that night. This is particularly true since Loeb testified that he initially believed Keonte was the person who committed robbery with Latiki that night. This Court cannot be certain that Loeb's speculative testimony had only a slight effect on the jury. This Court should reverse the conviction and remand for a new trial.

*The Court should reform the judgment because it incorrectly reflects a finding of true to the enhancement paragraph.*

**POINT OF ERROR 4, RESTATED**

*The Court should reform the judgment to reflect the correct offense.*

**(Jointly Argued)**

This Court should exercise its authority to correct the judgment in this case. This Court has the authority to amend the judgment to "speak the truth" when it has the necessary data and information to do so. TEX. R. APP. P. 43.2(b); *Bigley v. State,* 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993); *Asberry v. State,* 813 S.W.2d 526, 529-30 (Tex. App.—Dallas 1991, pet. ref'd). The record provides the necessary information and data for this Court to correct the inaccuracies in the judgment in this cause.

**Finding on Enhancement Paragraph**

Appellant pleaded true to the enhancement paragraph.[10] (RR6: 4). The judgment in this case reflects that the jury found the enhancement paragraph true. (CR: 82). However, the record in this cause does not include the jury charge on

---

[10] The record does not include the transcription of the enhancement paragraph the judge read to the jury. (RR6: 4).

32

punishment or the verdict form on punishment.[11] When the judge read the jury's verdict form, her statement did not include any reference to the enhancement paragraph. (RR6: 14). Nor did the trial court's pronouncement of sentence contain any reference to the finding on the enhancement paragraph. (RR6: 15). Nor does the trial court's docket sheet make any reference to the finding on the enhancement paragraph. (CR: 6-9). Consequently, the judgment's recitation that the jury found the enhancement paragraph true is not supported by the record.

Without a finding of true to the enhancement paragraph, the proper range of punishment in this case is 5 to 99 years' or life imprisonment.[12] TEX. PENAL CODE § 29.03 (providing that aggravated robbery is a first degree felony); § 12.32 (providing that the punishment range for a first degree felony is 5 to 99 years or life imprisonment). This Court should remand this cause for a new punishment hearing.

---

[11] The undersigned attorney contacted the District Clerk's Office in an effort to supplement the clerk's record with the jury charge and verdict form on punishment. The clerk stated that a jury charge on punishment not signed by the judge as well as a blank verdict form on punishment was in the court file of this case. The clerk also stated that her version of the online database of the scanned court documents in this case contains a notation that the clerk asked the judge twice for the punishment charge and verdict form, but did not receive either from the judge.

[12] In the absence of the verdict form and punishment jury charge, it is not clear from the record what punishment range the trial court instructed the jury to consider in this case.

**Offense Name**

The judgment reflects that the jury convicted Appellant for "Aggravated Robbery with a Deadly Weapon 2nd." (CR: 82). The inclusion of "2nd" implies that this was Appellant's second conviction for aggravated robbery. However, there is no evidence in the record that this case was Appellant's second aggravated robbery conviction.

The enhancement paragraph in the indictment alleged a prior conviction for felony drug possession. (CR: 10). The State's notice of extraneous offenses does not include any other aggravated robbery case. (CR: 66). When the State offered, and the Court admitted, certified copies of Appellant's prior convictions and Appellant's stipulation to these exhibits, none of these documents reflected an aggravated robbery conviction. (RR6: 4-5; State's Ex. 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99). Consequently, the inclusion of "2nd" in the name of the offense is erroneous, and this Court should delete that notation from the judgment.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Appellant prays that this Court reverse the conviction and enter a judgment of acquittal. In the alternative, Appellant prays that this Court reverse and remand for a new trial. In the further

alternative, Appellant prays that this Court modify the judgment to correct the inaccuracies therein.

Respectfully submitted,

/s/ Julie Woods

Lynn Richardson  
Chief Public Defender  
Dallas County, Texas

Julie Woods  
Assistant Public Defender  
State Bar No. 24046173  
Frank Crowley Courts Building  
133 N. Riverfront Blvd., LB-2  
Katherine A. Drew  
Chief, Appellate Division  
Dallas County Public Defender's Office

Dallas, Texas 75207-4399  
(214) 653-3550 *(phone)*  
(214) 653-3539 *(fax)*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on the Dallas County Criminal District Attorney's Office (Appellate Division), 133 N. Riverfront Blvd., 10th Floor, Dallas, Texas 75207, by eServe on May 19, 2015.

/s/ Julie Woods  
Julie Woods

## CERTIFICATE OF COMPLIANCE

I certify that the word count in this document, which was prepared in Microsoft Word 2010, is 8,796.

/s/ Julie Woods  
Julie Woods